People of the State of Illinois, Plaintiff-Appellee, v. James R. Walker, Defendant-Appellant.

Gen. No. 51,154.

First District, Second Division.

October 15, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Carolyn Jaffe and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Richard A. Rinella, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE LYONS delivered the opinion of the court.

Defendant, James Walker, was convicted in a bench trial upon Count I of a two-count indictment charging him with the offense of armed robbery. He was thereafter sentenced to a term of from not less than two (2) nor more than ten (10) years in the State Penitentiary. Defendant appeals asserting as alternative contentions on review (1) that he was not brought to trial within 120

days of incarceration as required by statute, and (2) that the evidence failed to establish his guilt beyond a reasonable doubt.

With regard to the first of his theories on appeal, defendant alleges that he was arrested and taken into custody on August 12, 1965. There is no dispute but that defendant remained in custody because of an inability to meet bail. There appears, however, some indication in the Report of Proceedings that the arrest may not have been made until August 20, 1965. The common-law record is silent in this respect. On September 15, 1965, an indictment was returned against defendant charging him in two counts with the armed robberies of Ernestine Hunter (Count I) and one Willie Franklin (Count II). The offenses were alleged to have occurred on June 25, 1965.

Defendant was subsequently arraigned on the charges on September 22, 1965. The court at that time appointed an Assistant Public Defender through whom he entered respective pleas of not guilty. The case was thereupon assigned to Judge Alphonse Wells for trial. The very next day, before a trial date had been designated, defendant, by counsel, filed a written motion for a substitution of judges naming another judge in addition to Judge Wells. Judge Wells sustained the motion and promptly transferred the cause to the Chief Judge of the Criminal Division. The case was then reassigned that same day to the eventual trial judge, Judge Walter P. Dahl.

On November 4, 1965, the instant case reached the trial call. Defendant appeared and answered ready for trial, however, requesting of the State to waive formal notice of motion with respect to a motion for a Bill of Particulars he apparently intended to make. Defendant, in addition, made a motion for a reduction in his bond. The State similarly answered ready, but explained that it was appearing without witnesses because of its understanding that the court would be otherwise occupied that day. The

court thereupon entered an order reducing bond to $5,000 and, on its own motion, continued trial of the case until November 8, 1965, without objection.

On November 8th, the case was continued until December 9, 1965, for reasons that do not appear of record. The order was entered on the court's own motion without objection. On December 9th the cause was reconvened. Defendant again answered ready for trial, at the same time informing the court of his nonreceipt of a list of prospective witnesses or parties to oral or written statements from the State. The State again explained that it had not brought in its witnesses on the understanding that the court would be engaged in another proceeding. On the court's own motion, the State was ordered to furnish defendant with a list of witnesses within 15 days, the cause being continued accordingly by the court until January 3, 1966, without objection.

On January 3rd, defendant filed a written and verified pro se motion for discharge and dismissal of the indictment pursuant to section 748 of the Criminal Code.[1] The motion alleged in substance that, notwithstanding the accused's continued readiness to stand trial, more than four months (120 days) had elapsed since defendant had been first placed in custody. While acknowledging his successful motion for a substitution of judges, defendant averred that neither such motion nor any other conduct on his part caused or contributed to the delay in the proceedings.

Defendant's motion was taken under consideration by the trial judge and denied without hearing argument. The case was thereafter continued until January 12, 1966, because of the unavailability of certain State's witnesses due to illness. The trial commenced on January 12th. At no juncture in the proceedings below did the State make

[1] Section 748 of the Criminal Code however had since been superseded and replaced by section 103-5 of the Code of Criminal Procedure. Ill Rev Stats (1965) c 38, par 103-5.

a formal or informal application to the court for an additional 60 days to procure material evidence as was open to them by the controlling statute. Ill Rev Stats (1965) c 38, par 103–5(c) (e).

A consideration of these attending circumstances impels this court to conclude that defendant, by his actions, substantially contributed to the delay for which he now complains. The statute upon which his case is predicated states:

> "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant, by a competency hearing, or by an interlocutory appeal." (Ill Rev Stats (1965) c 38, par 103–5(a) ).

We think it implicit in the phraseology of this statute that, as a matter of reciprocal obligation, an accused seeking its guarantee must himself be held to some measure of restraint in exercising certain of the pretrial tactical motions available to him. We speak in more specific terms of defendant's motion for a substitution of judges, albeit made at the earliest opportunity, and its adverse effect upon the orderly administrative process necessarily a part of bringing his cause to trial. The issue essentially invokes a balancing concept underscored by a long recognized element of practical consideration for the expeditious handling of such matters. People v. Iasello, 410 Ill 252, 102 NE2d 138 (1951). From within this framework, we regard the precedent of People v. Iasello, supra, and People v. Rankins, 18 Ill2d 260, 163 NE2d 814 (1960), to be of particular importance.

In Iasello, motions were made by the accused for a separate trial from his coindictees and for a change of venue. Contrary to the erroneous distinction defendant attempts to draw from the authority of People v. Hatchett, 82 Ill App2d 40, 226 NE2d 97 (1967), Iasello in-

volved a change of venue in name only. There, as here, the motion for a change of venue was granted and implemented by a simple substitution of judges from within the same judicial circuit. Again as here, the necessary transfer to the chief judge and reassignment of the cause was effectuated by the court on the same day.

To the extent that the Iasello decision is depreciated in value, we recognize that there both of the accused's motions had been made well after his cause had been placed on call for trial, but apparently before an actual trial date had been set. The court in Iasello employed the following reasoning in which we concur:

> ". . . In the present case plaintiff in error successfully presented motions for a separate trial and for a change of venue, both of which occurred at a time when the cause was on call for trial, and both of which necessitated its return to the chief justice of the criminal court for reassignment to another judge. Although each motion was followed with a demand for trial at the term of court then in progress, such a demand does not obviate the fact that *delay necessarily resulted from each motion.* Plaintiff in error thus created the necessity for postponement of his trial to an extent which precludes him from availing himself of the statute upon which he relies." (Emphasis supplied.)

Quite similarly in People v. Rankins, 18 Ill2d 260, 163 NE2d 814 (1960), our Supreme Court treated motions for a change of venue and for a substitution of judges as being synonymous, and again construed the granting of the motion as causing a delay chargeable to the accused. The court there stated:

> ". . . We have repeatedly held that where a defendant has sought and obtained a continuance within the period in question [citations omitted], or when he asks for and receives a change of venue (People v.

Iasello, 410 Ill 252,) or by his own action he has otherwise caused the delay, the right to be tried within the four-months period is temporarily suspended [citations omitted], and the statute does not apply until a new four-months' period has elapsed. (citations omitted)."

Accord: People v. DeStefano, 85 Ill App2d 274, 229 NE2d 325 (1967); People v. Williams, 31 Ill App2d 230, 175 NE2d 576 (1961).

The determinative criterion in each case must be whether the defendant's actions, in fact, caused or contributed to the delay. People v. Fosdick, 36 Ill2d 524, 224 NE2d 242 (1967). Accordingly, we cannot consider defendant's cited authority of People v. Shaw, 24 Ill2d 219, 181 NE2d 120 (1962), involving an accused's pretrial request for a psychiatric examination, as so much as remotely applicable.

Defendant's case of People v. Hatchett, 82 Ill App2d 40, 226 NE2d 97 (1967), is similarly of little contrary persuasion. The factual setting there was quite complex. Suffice to say that the case essentially involved the State's attempt to indict the accused twice for the same offense. Only after the original indictment (No. 578) had been dismissed by the court on motion of the State recognizing the delay, did the question of the 120-day rule in regard to trial under the latter indictments (Nos. 95 and 97) arise. As it related to the court's dismissal of the second indictments, the State appealed contending that the accused's motion for a substitution of judges (as to trial under indictments Nos. 95 and 97), filed when all the indictments were still pending, tolled the running of the 120-day statute.

Quite obviously, the pivotal but inarticulated basis for the Hatchett decision was upon a theory of double jeopardy and not upon the accused's right to a speedy trial as defendant suggests. Of further interest is the fact that the actual substitution of judges in Hatchett was ef-

fectuated without the transfer and reassignment of the causes prevalent in the case at bar.

██ It is the court's opinion that defendant's motion to substitute judges of necessity caused certain disruption and some delay although that delay be administrative in nature and unascertainable in duration from the state of the record. We furthermore envision no repugnancy with our statutory provisions allowing for the substitution of judges (Ill Rev Stats (1965) c 38, par 114–5), a fortiori, such a substitution is compulsory upon the court if made, as here, within 10 days after the cause has been placed on the trial call of a judge. People v. Lagardo, 82 Ill App2d 119, 226 NE2d 492 (1967). We find the record moreover to bespeak of a continuing acquiescence on the part of defendant to the various continuances ordered on the court's own motion notwithstanding the contrary averments of his motion for discharge and dismissal of the indictment. We therefore feel that the lower court properly denied that motion.

█ Next we consider defendant's alternative contention challenging the sufficiency of the evidence. As against his alibi defense, defendant brings his theory to focus upon two primary elements of the State's case; to wit, (a) the susceptibility of the human sense of visual perception and recall to honest but mistaken belief, and (b) the absence in the instant case of corroborative circumstances to otherwise support the eyewitness identifications. Having reviewed the facts of the case however, we find defendant's argument hypothetically sound but substantially unsupported by the evidence.

The complainant, Ernestine Hunter, had arrived at her home at 6529 South Bishop, Chicago, on the evening of June 25, 1965, carrying a substantial amount of cash in her handbag. The money represented the receipts from her personally owned beauty parlor which was located approximately three blocks from defendant's residence. At about 11:30 p. m., the complainant was in her bed-

289

room with a friend, Willie Franklin. Also present in the house, in the kitchen, were her children, Celest, Sandra, Beverly and Mark, as well as one of her daughter's friends, Rosetta.

Sandra, a high school senior, testified that she had observed an intruder making his entry into the house through the kitchen door. He was carrying a revolver which frightened some of the children and caused them to scream. The intruder threatened the children to remain silent and then headed for her mother's bedroom. After having had occasion to observe the man face to face for possibly five to ten seconds, Sandra fled out the rear door to summon the police.

Aroused by the children's outcries, Willie Franklin opened the bedroom door and was immediately confronted at gunpoint by the offender. The children were summoned into the room and all were ordered to lay face down on the bed. Mrs. Hunter, however, stated that she had remained faceup upon the bed. The assailant rifled the closet and discovered approximately $500 in the complainant's handbag. He seized the bag and took flight, being pursued by Mr. Franklin and Mrs. Hunter. The man had allegedly remained in the lighted bedroom for about five minutes and was, at times, as close as two feet away from the complainant.

Returning from calling the police, Sandra observed the offender run past an automobile parked near her home. The keys were in its ignition and the motor was running. Subsequent police investigation revealed that the car was a 1953 Buick sedan bearing 1965 Illinois license plate No. NP6237 which number was registered to defendant for a 1956 Pontiac automobile. At trial, by means of testimony and documentary evidence, defendant purported to show that he had sold the Buick to one Carl Whitmore earlier on the date in question and had permitted Whitmore to retain his license plates solely for the purpose of transporting the car to the former's home.

290

The doubt defendant attempts to raise from this evidence we, however, value as superfluous. The alleged contract for the purchase of the vehicle (Defendant's Exhibit No. 1) was admittedly drafted by defendant and was particularly self-serving to him. Nothing appears to affirmatively establish, moreover, that possession of the Buick had been relinquished to Whitmore, nor was he produced to testify as a witness in defendant's behalf. Whitmore, furthermore, was described by defendant himself as being considerably taller than he, and at least 20 years his junior.

Within five minutes after the robbery, Police Officer Fox responding to a call, arrived at the scene. Both Mrs. Hunter and her daughter, Sandra, gave a description of the offender to the officer. Mrs. Hunter testified that she had described the man as being about 5' 9" tall and 145 lbs. In addition to his complexion, clothing and grade of hair, the complainant had observed that the offender wore a big mustache and had a scar around one of his eyes. Sandra testified that she had similarly described the mustache and scar to the police, stating further that the man was slightly taller than she (5' 6") and thin.

Shortly after their conversation with Officer Fox, Mrs. Hunter was taken to the hospital in a hysterical condition. She was administered to, presumably by the injection of a sedative, and returned home. At approximately 5:00 a. m. the following morning, Police Detective Niemiec arrived at the Hunter residence with four or five photographs to show the witnesses. Both the complainant and her daughter identified defendant as the offender from among the pictures exhibited to them. The two witnesses subsequently made identifications of the accused at the preliminary hearing following his arrest and again at trial.

We think these circumstances, in and of themselves, demonstrate an instance of credible and unmistaken eyewitness identification. There is no dispute but

that defendant answered to the physical descriptions given at the scene within minutes of the robbery. By his own testimonial admissions, defendant was, in fact, wearing a mustache (although thinner than described) on the date of the occurrence and resided in close proximity to the complainant's business establishment. The eyewitnesses themselves remained unshaken in the belief that defendant was the man they had observed. The link between defendant and the car observed in the vicinity of the Hunter residence, moreover, cannot be lightly dismissed from consideration. Where, as here, there are eyewitnesses of a credible character who observed the accused under physical circumstances conducive to a positive identification, it has been repeatedly held that their testimony alone is sufficient to support a conviction even though contradicted by the accused. People v. Brinkley, 33 Ill2d 403, 211 NE2d 730 (1965).

██ ██ In view of the foregoing, we need not dwell at length upon the strength or weakness of defendant's alibi defense which had been submitted through the testimony of defendant, his wife, niece and two friends. While unimpeached in its more important aspects, the alibi testimony essentially involved a determination of the credibility of the respective witnesses at the trial level of the proceedings. As has been often stated in the review of bench trial convictions, the determination of the credibility and weight to be afforded testimony is for the trier of fact to alone resolve. Lest the State's evidence be so unsatisfactory or unconvincing so as to raise a reasonable doubt of guilt, a reviewing court will not substitute its own judgment for that of the trial judge. It remains axiomatic that the trial court, having listened to and observed the witnesses before it, is in a particularly more suitable position to make those determinations. People v. Webb, 85 Ill App2d 417, 229 NE2d 300 (1967).

Lastly, defendant alludes to the authority of People v. Strong, 21 Ill2d 320, 172 NE2d 765 (1961) and People

v. DiVito, 66 Ill App2d 282, 214 NE2d 320 (1966), in support of the proposition that the State's failure to call Willie Franklin as a witness or otherwise explain his absence gives rise to an inference that his testimony, if given, would have been unfavorable to the prosecution of the case. While we do not quarrel in principle with the rule, we do not deem the simple failure to produce this witness as sufficient, in view of the otherwise affirmative stature of the State's case, to create a reasonable doubt as to defendant's guilt.

We think that the trial court's cognizance of this element is more than reflected in its granting of defendant's motion for a directed finding of not guilty as to the charge in the indictment addressed to the alleged robbery of Mr. Franklin (Count II).

For the above reasons, the judgment is affirmed.

Affirmed.

BURKE, P. J. and McNAMARA, J., concur.